# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

JOHN M. FLOYD & ASSOCIATES, INC.,    )
    )
    Plaintiff,    )
    )
    v.    )    CAUSE NO.: 1:01-CV-355-TS
    )
STAR FINANCIAL BANK,    )
    )
    Defendant.    )

## OPINION AND ORDER

## BACKGROUND

The Plaintiff, John M. Floyd & Associates, Inc., is a bank consultant. The Defendant, Star Financial Bank, is a bank which the Plaintiff agreed to consult. The parties' contractual relationship began in March 2000, when they signed an agreement to work with each other. Soon after, the Plaintiff recommended that the Defendant implement a nonsufficient funds/overdraft protection program for its checking account customers and sell its Credit Card Portfolio. The Defendant rejected the recommendations but chose other consultants to implement the programs similar to or the same as the ones recommended by the Plaintiff. Claiming that the Defendant implemented the Plaintiff's recommendations, the Plaintiff demanded payment. The Defendant refused, insisting that it implemented the recommendations from the Plaintiff's competitors, not the Plaintiff.

Now the parties dispute as to what they agreed. The Plaintiff claims that their agreement mandates the Defendant to pay the Plaintiff a share of the Defendant's profits derived from implementing the Plaintiff's recommendations, even if the Plaintiff did not install the

recommendations into the bank's system. The Defendant counters that its obligation to pay the Plaintiff arises only if it derives profits from the Plaintiff's recommendations that were approved by the Defendant and installed by the Plaintiff into the bank's system.

As a result of their disagreements, the parties are before this Court. On October 8, 2003, the Defendant moved for partial summary judgment, asking the Court to recognize that the Defendant had no obligation to compensate the Plaintiff for its two recommendations that the Defendant did not install. The Plaintiff opposed the motion on December 22, 2003, arguing that genuine issues of material fact preclude summary judgment. The Defendant replied on January 26, 2004. On April 5, 2005, the Plaintiff filed a supplemental brief in opposition to the Defendant's motion for partial summary judgment, and the Defendant replied to that submission on April 20.

In addition, on December 22, 2003, the Plaintiff moved to strike paragraph 7 of James Marcuccilli's affidavit, submitted with the Defendant's Motion for Partial Summary Judgment. The Plaintiff did not respond to the motion. Rather, on July 14, 2004, it filed its own motion seeking to strike John M. Floyd's affidavit, submitted with the Plaintiff's Response to the Defendant's Motion for Partial Summary Judgment. To this the Plaintiff responded on August 9, 2004.

**DISCUSSION**

**A.  The Plaintiff's Motion to Strike**

The Plaintiff requests the Court to strike paragraph 7 from James Marcuccilli's affidavit, submitted with the Defendant's Motion for Partial Summary Judgment. In this paragraph, James Marcuccilli states: "[The Plaintiff] was to be compensated by receiving one third of [the Defendant's] first year's annualized increased earnings which resulted directly from the [Plaintiff's]

recommendations which [the Defendant] approved and installed, plus out of pocket expenses." The Plaintiff argues that James Marcuccilli, by using the word "directly," which is not found in the agreement, is attempting to state a legal conclusion about the parties' obligations under the agreement. The Defendant has not responded to the Plaintiff's Motion.

The Court agrees with the Defendant's argument and will not consider paragraph 7 of James Marcuccilli's affidavit in evaluating the Defendant's Motion for Partial Summary Judgment. *See Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) ("Because legal argumentation is an expression of legal opinion and is not a recitation of a 'fact' to which an affiant is competent to testify, legal argument in an affidavit may be disregarded.").

**B.  The Defendant's Motion to Strike**

The Defendant requests to strike the entire affidavit of John M. Floyd, submitted with the Plaintiff's Response to the Defendant's Motion for Partial Summary Judgment. In paragraph 7, speaking on the issue of whether the Defendant provided the Plaintiff with a list of projects to be excluded from the Plaintiff's study, he stated:

> There was a meeting at which I was present with Ms. Gregerson on February 1, 2000. Ms. Gregerson did state on February 1 that [the Defendant's] management was already working on some revenue generating and expense saving projects. However, I told her she needed to give us a complete list of any project which she was referring to, so we would know which areas would be excluded from our study. She never provided any such list, and no one at [the Defendant's] ever provided us with any list of such projects or claimed any items were "off the table."

The Plaintiff incorporated this statement in its Response.

The Defendant argues that Floyd's statement in the affidavit—"I told her she needed to give us a complete list of any project which she was referring to, so we would know which areas would

3

be excluded from our study"—is contradicted by his answer to a question during his deposition. On April 26, 2004, the Defendant's counsel deposed Floyd and, among other things, asked him questions about the February 1 meeting:

Q.   What did he say about those things he had going?

A.   He didn't say—best that I can remember, he didn't say anything about the things going, they said—he said they had a lot of things going, and I made the point to him that, before we start the study he can take everything that's not allowed to be studied off—"off the table."

Q.   What did he say?

A.   If I remember correctly, he said okay.

Q.   So, the words "off the table" were used at that meeting?

A.   Yeah, either "off the table" or "excluded," one of the two, yes, sir.

Q.   Were you the one that used the word "off the table," or did Tom or Jim use the word?

A.   It would— it would have probably been me. I—I would use the words "off the table" or "excluded," or both, I don't know.

Q.   Could you tell me why either Tom or Jim Marcuccilli was concerned about that?

A.   Other than the statement they made that they had a lot of things going.

Q.   Was there anything said by you about compensation for things that were "off the table?"

A.   I think that what – what we said was, is that—that if—that—that we would not study things that were "off the table."

Q.   Did you or anybody from the John Floyd side say words to the effect that, "If there are things that are in progress, those are "off the table" and you will not have to compensate us for those"?

A.   I believe what we said was, is, "You identify what is "off the table," and we will not study those areas, etc."

Q.   So you had a legitimate concern that you did not want to use your resources in areas where they had already plowed the ground?

A.   Correct.

Q.   Did you ask them for a list of what was in progress or "off the table?"

A.   Well, what we said was, is that when we get ready to start the project, we will ask you for a list of what is "off the table" at that point in time which you do not want us to look at.

Q.   But at the 2/1/2000 meeting, I hear you saying you did not ask them for such a list?

A.   Well, their-they had not agreed to go forward with us, so it didn't make any difference if they had a list or didn't.

Q.   That's not my question. The question is, Mr. Floyd, did you ask anybody at the 2/1/2000 meeting for a list of what they believed was "off the table?"

A.   No, sir, to the best I remember.

Floyd's Dep. at 33–35.

According to the Defendant, Floyd contradicted himself when he answered the deposer's question—"did you ask anybody at the 2/1/2000 meeting for a list of what they believed was "off the table"?—stating: "No, sir, to the best I remember."

The Plaintiff does not perceive the statements in the affidavit and the deposition as contradictory. Instead, the Plaintiff urges that, when read within the context, they are consistent:

> When Floyd testified in his deposition that he did not ask anyone at the meeting for a list of what they believed as off the table, it is apparent that he meant that he did not ask that [the Defendant] produce its list to Floyd during the February 1st meeting. It is equally apparent that he testified in his deposition that such a list would need to be produced when [the Plaintiff] was ready to start the project. The Floyd affidavit in no [sic] suggests that he requested that [the Defendant] produce a list of projects to [the Plaintiff] during the course of the February 1st meeting, nor is it intended to create such an impression. The disputed affidavit testimony simply indicates that Floyd did in fact tell [the Defendant] that it would be necessary for [the Defendant] to create a list of excluded projects. Whether or not [the Defendant] was asked to actually produce the list during the course of the February 1, 2001 meeting was immaterial. What is material is whether or not that [the Plaintiff] notified [the Defendant] that [the Defendant] would have to identify projects which were off the table at some point prior to the start of [the Defendant's] work on the project. Floyd's affidavit and deposition testimony both indicate that such message was delivered, and they are entirely consistent.

Pf's Resp. at 5.

The Plaintiff's argument is convincing: Floyd's deposition and affidavit are consistent in so far as they state that Floyd requested Gregerson to give him a list of projects off the table *before* they begin analyzing the Defendant's finances, not necessarily *during* the February 1 meeting. The Defendant's Motion is a distraction from the core issue that, although the Plaintiff requested a list of projects off the table, the Defendant never provided such a list. Accordingly, the Motion will be denied.

## C.  The Defendant's Motion for Partial Summary Judgment

**(1)** *Summary Judgment Standard*

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's

claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir.1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

**(2)** *Material Facts*

The Plaintiff, John M. Floyd & Associates, is a retail banking services consultant from Bayview, Texas. In late 1999, the Plaintiff offered the Defendant, Star Financial Bank, its services on contingency to increase the Defendant's revenues and to decrease operating expenses. The Defendant accepted the offer on March 24, 2000, by signing an engagement letter. Among other things, the letter, which was drafted by the Plaintiff, contained the following provisions:

> Objectives
> During our preliminary analysis we identified the following objectives for [the Defendant] where our assistance would be of measurable benefit. Our emphasis will be on assisting [the Defendant] to become more competitive through the installation of value-added products, improved cash management systems and improved collections of operating income. . . . I have summarized the objectives as follows:
>
> Non-Interest Income & Investable Funds
> 1.      Perform a comprehensive analysis of [the Defendant's] competition in each major market.
> 2.      Perform a comprehensive analysis of the profitability of existing products and services.
> 3.      Assist the bank in development and installation of saleable, value-added products.

4.    Perform a comprehensive analysis of the check collection alternatives, bank charges and any other factors affecting investable funds.
5.    Perform a comprehensive analysis of all other non-interest income and assist the bank in the installation of reasonable changes.
6.    Install programs for enhanced customer acquisition and retention.
7.    Install systems to monitor income streams to assure that the bank is receiving the appropriate income.

Cost of the Assignment
The cost to [the Defendant] for the engagement will be one-third of the first-year's pre-tax earnings that are the results of our recommendations plus out-of-pocket expenses.

Payment
. . .
Approximately12 calendar months following completion of the initial engagement and the installation of the approved recommendations we will quantify the results of our efforts and [the Defendant] agrees to pay one third of the first years annualized increased earnings minus the refundable retainers. The bank will have the final decision as to the installation or recommendations and only approved and installed recommendations will be used to quantify earnings.

. . .

Conduct of the Engagement
. . . While the majority of the work will require that we be on site, certain aspects are best handled from our office. Thus the number of our personnel at any one-time will likely range from 1 to 2 professionals, plus associated support staff.
[The Defendant] will furnish us with suitable workspace isolated from traffic and access to such office equipment as printers, photocopiers, telephones, etc., to complete the assignment in the most timely and efficient manner possible.

Presentation Phase
1.    Weekly we review with management our recommended changes and the results, which can be expected.
2.    Identify those recommendations that are approved. Formulate a plan and timetable for installation and designate the individuals from the client's staff and from our staff who will be responsible for installation.
3.    Meet with the affected parties to review and "sell" the recommendations, which have been approved by management for installation.

Installation Phase
1.    Coordinate and assist in installation of approved changes.

    2.      Design and install monitoring and reporting mechanisms in order to chart progress, performance and results

    <u>Follow-up Phase</u>
    1.      Meet with management to review the status and results of changes, which have been approved for installation.
    2.      Develop and install any adjustments required to "fine-tune" the processes we have installed.

Engagement Letter at 1–6.

(a) *The Nonsufficient Funds/Overdraft Program*

Even before the signing of the engagement letter, the Plaintiff stated some of its goals to the Defendant. In a meeting with Karen Gregerson on January 31, 2000, John M. Floyd and Ron Jennings told her that they intended to propose to the Defendant to adopt a nonsufficient funds/overdraft program (NSF/OD) for its checking account customers. The following day, on February 1, the Plaintiff assured the Defendant that it was not interested in any of the Defendant's projects that were already in progress. In fact, the Plaintiff asked Gregerson to give it a list of such projects before it began analyzing the Defendant's finances, but the Defendant never provided the Plaintiff with such a list.

Soon after the engagement letter was signed, Mark Roe, who began researching proposals for the Defendant, sent a memo to Gregerson requesting certain financial information, including the records about the Defendant's nonsufficient funds policy. On April 24, 2000, the Plaintiff, through Mark Roe and Judi Johnston's presentation, recommended to the Defendant that it offer NSF/OD to its checking account customers. The Plaintiff estimated that, after implementing this program, the Defendant would get an additional $1,631,471 in pretax revenues. On the basis of this projection, the compensation to the Plaintiff would have been $543,000. At the presentation, Gregerson probed

Roe why they needed the Plaintiff to install the NSF/OD program: "Well, why wouldn't we just do this ourselves, if all it is, is a change in philosophy? Instead of returning checks, you keep them. Why would—why can't we just do this ourselves." (Gregerson Dep. at 226.) Later, at a meeting following the Plaintiff's recommendation, the Defendant's Executive Committee considered implementing the NSF/OD program on its own.

But this was not the first recommendation the Defendant had received to implement an overdraft protection program. Almost a year before the Plaintiff began its relationship with the Defendant, on August 13, 1999, Gregerson attended a presentation by Stratis Technologies, Inc., from Louisville, Kentucky, which also offered the Defendant its services to improve the Defendant's operations and revenues through an insufficient funds and overdraft protection program. Stratis's program was called Overdraft Management Strategy. Stratis estimated that the Defendant's first year revenue from implementing such a program would be about $700,000. Stratis's fee for installation of the program would have been $115,000. At that time, the Defendant declined Stratis's offer. Nevertheless, Stratis continued solicitation calls to Gregerson, which went unanswered.

However, the Defendant revisited Stratis in April 2000. At that time, Gregerson called Stratis and on May 31, just over a month after the Plaintiff made its NSF/OD program recommendation to the Defendant, Stratis made its presentation to the Defendant and offered its Overdraft Management Strategy.[1] This presentation was much the same as the one in 1999. Stratis again estimated the increase in the Defendant's revenues would be about $700,000 and proposed the same fee of $115,000. A month later, on June 30, 2000, the Defendant signed a letter of engagement with Stratis

---

[1]Sherri Miller, the Defendant's Senior Vice President for Strategic Development, also called Stratis. She spoke with Mr. Bode of Stratis and asked him to implement "the Overdraft Program that had been recommended on April 24 by [the Plaintiff]." (Miller Dep. at 379.)

and, during the last week of July 2000, Stratis began implementing and installing the overdraft protection program for the Defendant. Along with this program, Stratis installed its own software for the management of the Overdraft Management Strategy. The Defendant advertised the overdraft protection service as Courtesy Coverage Policy.

Diane Barnett, the Defendant's Deposit Operations Manager, drafted a brochure for the Defendant's customers describing the new Courtesy Coverage Policy. In its initial draft, Barnett copied 83% of the program's description from a brochure produced by the Plaintiff. Once the brochure was finalized, 70% if its content was derived from the Plaintiff's brochure.[2]

The Defendant did not immediately inform the Plaintiff that it had an engagement with another company to install an NSF/OD program. Sometime in May 2000, Marcuccilli advised the Plaintiff that the Defendant was already looking into an overdraft protection program and that any such program was "off the table" for the Plaintiff.

When the Plaintiff made its recommendation regarding the OSF/OD program, it was ready and willing to install the program for the Defendant.

(b) *The Sale of the Defendant's Credit Card Portfolio*

Since at least 1996, the Defendant has consulted with Kessler Financial Services in Boston, Massachusetts, regarding its credit card business. In October 1996, Todd J. DaCosta of Kessler Financial Services recommended to the Defendant to sell its merchant credit card processing business to NOVA Information Systems, Inc., and the Credit Card Portfolio to MBNA America

---

[2]The Defendant points out that the language in its brochure was nearly identical to Stratis's brochures used with other banks. At this stage of the proceedings, the Court resolves all genuine issues in the Plaintiff's favor and need not consider any alternative sources for the contents of the Defendant's brochure.

Bank, N.A.[3] The following year, the Defendant sold the merchant credit processing business but turned down the sale of the Credit Card Portfolio.

Two years later, a company in the business of managing and acquiring credit card portfolios, InfiCorp, showed its interest in the Defendant's Credit Card Portfolio. On June 17, 1999, InfiCorp presented the Defendant with an option for the management or outright purchase of the Defendant's Credit Card Portfolio. The following month, the Defendant entered into a mutual confidentiality agreement with InfiCorp but soon afterward declined to enter into a transaction with the company.

The Plaintiff, too, considered the sale of the Defendant Credit Card Portfolio. Soon after the signing of the engagement letter with the Defendant on March 24, 2000, the Plaintiff began analyzing the Defendant's finances, and evaluating whether the Defendant should sell its Credit Card Portfolio.

Meanwhile, on April 5, 2000, the Defendant contacted Kessler about starting the negotiations with MBNA for sale of its Credit Card Portfolio. The next day, on April 6, Kessler's representative wrote to the Defendant requesting certain financial information necessary for the preparation of the portfolio's sale. The Defendant did not respond until July 21.

On May 16, 2000, the Plaintiff, in a presentation to the Defendant's executive management, recommended that the Defendant sell its Credit Card Portfolio to "a leader in the credit card industry." After the presentation, the Defendant informed the Plaintiff that it was already engaged in negotiations for the sale of the portfolio and that the Plaintiff's services would not be needed in this area.

---

[3]Kessler conducted its business on behalf of MBNA and was its agent.

True to its word, the Defendant did not request any assistance from the Plaintiff in negotiating the sale nor otherwise involve the Plaintiff in the transaction. On July 21, 2000, in response to the April 6 letter from Kessler's representative, Thomas Marcuccilli sent a letter to Chris O'Leary of Kessler, stating that "after much procrastination, our executive committee has finally decided to pursue [selling our Credit Card Portfolio]." Sometime later, the Defendant chose Kessler to act as a broker and, after signing a confidentiality agreement with Kessler on September 22, 2000, sold its Credit Card Portfolio to MBNA on January 25, 2001. According to the Defendant's statement at the 2002 shareholder meeting, the sale of the portfolio resulted in enhanced income of $1.4 million, after taxes.

**(3)** *Analysis*

(a) *The Defendant's Contentions*

The Defendant argues that it is entitled to summary judgment as to the Plaintiff's claims that it must be compensated for the installation of the NSF/OD program and the sale of the Credit Card Portfolio. The Defendant claims that the Plaintiff requests a payment for work it never performed, but which was performed by other consultants; that the Plaintiff wants reward for mere recommendations and for analyzing the Defendant's financial information, rather than for the recommendations that were approved by the Defendant and installed by the Plaintiff. The Defendant insists that the parties' engagement letter requires compensation for the Plaintiff only for those recommendations that were "approved and installed," and that it had the "final decision" as to which recommendations would be approved and installed. On the basis of this language, the Defendant

14

believes that both parties acted in accordance with their agreement, even when the Defendant rejected the Plaintiff's recommendations.

The Defendant notes that the engagement letter was not an exclusive agreement between the parties that prohibited it from acquiring recommendations from other banking consultants. The Defendant also argues that it was not obliged to accept the Plaintiff's recommendations but could reject them for good reason or no reason at all.

(a) *The Plaintiff's Contentions*

The Plaintiff argues that, under the engagement letter, the Defendant was required to compensate the Plaintiff on the basis of the first year's earnings that were the "result" of the Plaintiff's recommendations. The Plaintiff believes that genuine issues of fact exist as to whether the Defendant's installment of the NSF/OD protection and its sale of the Credit Card Portfolio were the results of the Plaintiff's recommendations.

The Plaintiff insists that it would be unreasonable to construe the parties' agreement as permitting the Defendant to benefit from the Plaintiff's exhaustive analysis and then claim that it was refusing to approve the Plaintiff's recommendations, while installing them nevertheless. The Plaintiff states that the Defendant installed recommendations that were the same as the Plaintiff's, which shows that the Defendant approved them. The Plaintiff points to the Defendant's Courtesy Coverage Policy brochure and the depositions of Sherri Miller and Diane Barnett as proving that the Defendant installed its NSF/OD program. In addition, the Plaintiff notes that the Defendant sold its Credit Card Portfolio only after the Plaintiff proposed the sale. This, according to the Plaintiff, shows that the Defendant installed its recommendation to sell the portfolio.

15

The Plaintiff maintains that the engagement letter did not give the Defendant unconditional discretion regarding the Plaintiff's recommendations. The Plaintiff recognizes that the Defendant could reject its recommendations but notes that it could not then install those recommendations without crediting the Plaintiff. It relies on Indiana law that forbids a party to unreasonably withhold approval of another's performance. The Plaintiff's position is that, by installing the NSF/OD program and selling its Credit Card Portfolio, the Defendant accepted and installed the Plaintiff's recommendations.

Finally, the Plaintiff states that the Defendant prevented it from installing its recommendations, thus breaching the agreement between them.

(c) *Legal Standard*

In Indiana, parties to a contract have the right to define their obligations and the courts may not rewrite their contract. *Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1168 (Ind. Ct. App. 1995). "When the language of a contract is clear and unambiguous, the intent of the parties is determined from the four corners of the instrument. In such a situation, the terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions." *Eskew v. Cornett*, 744 N.E.2d 954, 957 (Ind. Ct. App. 2001) (citations omitted). "If the terms of the contract are unclear, ambiguous, or capable of more than one interpretation, we will construe them to determine and give effect to the intent of the parties at the time they entered into the contract." *In re Kemper Ins. Cos.*, 819 N.E.2d 485, 490 (Ind. Ct. App. 2004). "A contract is not considered ambiguous merely because a controversy exists; rather, ambiguity will be found when

16

a contract is susceptible to more than one interpretation as measured by the standard of whether reasonable minds could differ as to its meaning." *Id*. at 491 (citation and quotation marks omitted).

"In ascertaining the contract's clarity, or lack thereof, we consider the whole document, not just the disputed language. Construction of contract language that would render any words, phrases, or terms ineffective or meaningless should be avoided." *Id*. The court should presume that the parties meant the provisions in the contract and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions. *Id.* "When a contract contains general and specific provisions relating to the same subject, the specific provision controls."*George S. May Int'l Co. v. King*, 629 N.E.2d 257, 261 (Ind. Ct. App. 1994).

(d) *Analysis*

The parties' engagement letter is a general, open-ended agreement for consulting services. The letter does not specify any particular service—such as installation of an NSF/OD or the sale of the Credit Card Portfolio—that the Plaintiff was going to implement for the Defendant. Nor does the letter specify the length of the parties' engagement. Rather, the letter broadly notes the objectives of the agreement: to perform a comprehensive analysis of the Defendant's business and to assist the Defendant in development and installation of programs to increase its revenues. *See* Letter at 1–2. The letter does not state that the parties have entered an exclusive agreement.

Despite its generality, the agreement sets out four phases for the parties' conduct. The first phase requires the Plaintiff to analyze the Defendant's finances and its mode of operation, determine needed changes, and create a plan for the changes. During the second phase, the Plaintiff recommends the changes to the Defendant's management. The approved recommendations are then

17

identified and a plan and timetable are set out for the installation of the recommendations. In the

third phase, the Plaintiff coordinates and assists the installation of the approved changes. It designs

and installs monitoring and reporting mechanisms to chart progress, performance, and results.

Finally, during the fourth phase, the Plaintiff meets with the Defendant's management to review the

changes and develops and installs any necessary adjustments.

Also, the agreement specifies how and when the Plaintiff will be compensated for its

services:

> Cost of the Assignment
> The cost to [the Defendant] for the engagement will be one-third of the first-year's
> pre-tax earnings that are results of our recommendations plus out-of-pocket
> expenses.
>
> Payment
> . . .
> Approximately12 calendar months following completion of the initial engagement
> and the installation of the approved recommendations we will quantify the results of
> our efforts and [the Defendant] agrees to pay one third of the first years annualized
> increased earnings minus the refundable retainers. The bank will have the final
> decision as to the installation or recommendations and only approved and installed
> recommendations will be used to quantify earnings.

These two provisions are at the core of the parties' disagreement whether the Defendant

owes money to the Plaintiff. The Plaintiff focuses on the language under the heading Cost of the

Assignment: "The cost to [the Defendant] for the engagement will be one-third of the first-year's

pre-tax earnings *that are results of our recommendations* plus out-of-pocket expenses." (emphasis

added). The Defendant stresses the language under the heading Payment: "The [Defendant] will

have *the final decision* as to the installation or recommendations and *only approved and installed*

*recommendations* will be used to quantify earnings." (emphasis added). Thus, the Plaintiff believes

that, since it recommended and induced the Defendant to install the NSF/OD program and sell its

18

Credit Card Portfolio, the Defendant owes the Plaintiff the agreed share of the profits from the installation and the sale. The Defendant, however, insists that it did not approve the recommendations, let alone install them, and, as a result, owes nothing to the Plaintiff. The parties do not attempt to explain these provisions in light of each other.

The two seemingly inconsistent provisions relate to the calculation method of the Plaintiff's compensation. (The Court presumes that the parties intended both provisions in the contract.) Consistent with the rules of contractual interpretation, these terms can be reconciled to give effect to both provisions. The first provision deals with the matter of compensation generally. The second one addresses the matter more specifically and clarifies the term "our recommendations" in the first provision as "approved and installed recommendations." In such situation, the second provision controls. *See George S. May Int'l Co.* 629 N.E.2d at 261 ("When a contract contains general and specific provisions relating to the same subject, the specific provision controls.").

A contrary result would be inconsistent with Indiana law. If the first provision meant that the Defendant owed the Plaintiff for profits resulting from mere recommendations regardless of whether they were approved and installed, the second provision would be meaningless. Since the Plaintiff's mere recommendation would suffice to oblige the Defendant to compensate the Plaintiff, the mention of approved and installed recommendations to calculate the payment would be useless. Such construction, as explained above, must be avoided. *See In re Kemper Ins. Cos.*, 2004 WL 2940848, *5.

No other provisions in the engagement letter have any patent or apparent contradictions. The contract is clear on its face and the Court will determine its meaning from its four corners.[4] *Eskew*, 744 N.E. 2d at 957.

The parties' contract is not for the sale of ideas, which in this case were readily available elsewhere, but for the service of implementing the details that make the ideas work for the Defendant. As written, the letter requires the Defendant to compensate the Plaintiff only after the Plaintiff has entered the third phase of the parties' relationship, that is, after the Defendant approved the Plaintiff's recommendations and the Plaintiff began installing them (assuming that the recommendations result in increased profits), not after a proposal of an idea.

The agreement does not prevent the Defendant from soliciting a second opinion about the recommended matter or finding a better deal before the third phase begins. Therefore, even if, as the Plaintiff argues, the Defendant had no plans to install the NSF/OD program or sell its Credit Card Portfolio until the Plaintiff made these recommendations, the Defendant's choice of different companies to install the NSF/OD program and sell the Credit Card Portfolio did not breach the contract. If it were otherwise, the Defendant would be indefinitely precluded from choosing a competitor for any program that the Plaintiff recommended and that the Defendant rejected. Yet, this was not an exclusive contract, forbidding the Defendant from contracting with other banking consultants. *See, e.g., Inman's Inc. v. City of Greenfield*, 412 N.E.2d 126, 129 (Ind. Ct. App. 1980) (in a nonexclusive contract, a defendant was free to deal with the plaintiff's competitor).

The Plaintiff also argues that the Defendant unreasonably rejected its recommendations. The Plaintiff relies on cases, such as *Indiana Tri-City Plaza Bowl, Inc. v. Glueck's Estate*, 422 N.E.2d

---

[4]The parties did not argue that the engagement letter was ambiguous. Rather, they seemed to agree "that this case calls for a fairly straightforward application of Indiana contract law." Pf's Resp. at 28.

670 (Ind. App. 1981), and *Willig v. Dowell*, 625 N.E.2d 476 (Ind. Ct. App. 1993), recognizing that when performance is conditioned upon one party's satisfaction, that party may not reject the performance arbitrarily, capriciously, or unreasonably. The flaw of this argument lies in the Plaintiff's assumption that the engagement letter prevents the Defendant from rejecting a recommendation once it's made and working with other consultants on the same subject. As explained above, that was not the agreement. The Defendant was given "the final decision as to the installation of recommendations." The Defendant was free to reject the Plaintiff's recommendations before the commencement of the third phase. Had the Defendant allowed the Plaintiff to proceed to this phase and then unreasonably and capriciously rejected the Plaintiff's work, the Plaintiff's position may have merit. However, under the current circumstances, the argument is in vain.

To overcome summary judgment, the Plaintiff must show that it installed its recommendations and the Defendant did not compensate it. The Plaintiff is not entitled to payment for a competitor's installation of a program, even if the program is similar to or the same as the one recommended by the Plaintiff. Had the Plaintiff and the Defendant specifically contracted for the installation of the NSF/OD or the sale of the Credit Card Portfolio, the Defendant would have been precluded from seeking out the Plaintiff's competitors. *See John M. Floyd & Assocs., Inc. v. First Bank*, 2004 WL 2550453, at *5 (W.D. Va. Nov. 3, 2004) (where the contract specifically stated that the plaintiff's objective was to install its overdraft protection program, the defendant had no right to decline installation of that program without breaching the contract, even if the plaintiff has not yet presented the details of how it would implement the program). Here, however, the parties had an open-ended agreement that allowed the Defendant to reject the Plaintiff's recommendations and

21

seek advice from other consultants. As a result, only a showing that the Defendant installed the Plaintiff's recommendations will preclude summary judgment.

The question in this case is not whether but for the Plaintiff's recommendations the Defendant would not have pursued the NSF/OD program and the sale of the Credit Card Portfolio. That is irrelevant, for as noted above, the contract is not an exclusive agreement that prohibited the Defendant's business with anyone else. The question is whether the Defendant actually implemented, in whole or in substantial part, the Plaintiff's details of how to make the proposed ideas work. In that sense, there must be some evidence that either the Plaintiff did all the work implementing the programs or that the Defendant, or someone on its behalf, took the Plaintiff's blueprints, manuals, etc. as its own and used them to create the NSF/OD program or sell the Credit Card Portfolio.

But the Plaintiff has not demonstrated either possibility. First, the parties do not dispute that the Plaintiff did not implement the NSF/OD or conduct the sale of the portfolio. Second, the Plaintiff has not shown that Stratis implemented the Plaintiff's blueprints for the NSF/OD program or that the Defendant took its manuals and used them to conduct the sale of the Credit Card Portfolio.

The Plaintiff believes that Miller all but confessed that the Defendant installed the Plaintiff's NSF/OD program. During her deposition Miller stated that she asked Mr. Bode of Stratis to install the NSF/OD program recommended by the Plaintiff. Yet, no matter how this statement is construed, it does not say that Stratis took the Plaintiff's blueprints and used them as its own. Her statement is akin to a home owner, who after receiving house painting ideas from one painter, chooses another one to actually paint the house. It would be absurd for the first painter to insist on a payment for the

22

second painter's work, unless the first painter and the homeowner were in an exclusive contractual relationship.

Equally unconvincing is the Plaintiff's argument that the similarity in the Defendant's Courtesy Coverage policy brochure to its own demonstrates that Stratis or the Defendant installed its NSF/OD program. The brochure was but one, minuscule part of the efforts required to implement the NSF/OD program. It was merely a write-up for the Defendant's customers about the NSF/OD, not a blueprint or a manual of a step-by-step implementation of the program. The one-page brochure stands in vivid contrast with Stratis's software to accommodate the Defendant in expanding its banking services.

Finally, the Plaintiff's outcry that the Defendant sold the Credit Card Portfolio to MBNA on its own, after it received a recommendation to sell the portfolio to a leader in the credit card industry, rings hollow. Just as the homeowner in the above example would not have been liable to the first painter for breach of contract if, after his recommendation, she decided to paint the house herself, so is the Defendant free of any contractual obligation to the Plaintiff for choosing to conduct its own sale.

The Plaintiff argues that it would be unreasonable to construe the engagement letter as permitting the Defendant to benefit from the Plaintiff's exhaustive analysis and then claim that it was refusing to approve the recommendations, while installing them nevertheless. The Court agrees with the Plaintiff on this point. Once the Defendant installs the Plaintiff's recommendation—that is, substantially implements the Plaintiff's blueprints for the program—it has constructively approved it. But if the Defendant installs a competitor's recommendation, albeit similar to or the same one as the Plaintiff's, no automatic approval occurs. To the contrary, installation of another's

recommendation constructively acts as rejection of the Plaintiff's recommendation. *Cf.*, RESTATEMENT (SECOND) OF CONTRACTS § 43 ("An offeree's power of acceptance is terminated when the offeror takes definite action inconsistent with an intention to enter into the proposed contract and the offeree acquires reliable information to that effect.").

That is what happened here. The evidence, taken in light most favorable to the Plaintiff and with all inferences drawn in favor of the Plaintiff, is that the Defendant pursued Stratis and Kessler only after receiving recommendations from the Plaintiff to install the NSF/OD program and sell the Credit Card Portfolio. This resulted in an agreement to install Stratis's Overdraft Management System and the sale of the Credit Card Portfolio to MBNA America with Kessler acting as a broker. The Defendant's choice to employ Stratis and Kessler was an undisputable rejection of the Plaintiff's recommendations. The Defendant implemented Stratis's program in its entirety by installing its software to run the Overdraft Management Strategy and marketing the new program to its customers under the name Courtesy Coverage. The Defendant used Stratis's, not the Plaintiff's, customer letters, operational instructions, instruction manuals and so on. At most, Stratis or the Defendant copied 70% of material from one of the Plaintiff's brochures to describe to its customers the Courtesy Coverage Policy, which is insufficient to create a genuine issue of fact whether the Defendant installed the Plaintiff's NSF/OD program.

Also, since May 16, 2000, when Thomas Marcucilli informed the Plaintiff that it was seeking other brokers for the sale of its Credit Card Portfolio, the Defendant has not requested any assistance from the Plaintiff to sell the portfolio. These facts negate one of the Plaintiff's main contentions—that the Defendant installed the Plaintiff's recommendations. The Defendant might have been motivated by the Plaintiff's analysis and the recommendations that flowed out of it, but

24

there is no evidence that the Defendant sold the portfolio using the Plaintiff's materials. As a result, the Plaintiff is not entitled to a share of the Defendant's profits derived from the sale of the Credit Card Portfolio.

Finally, the Plaintiff is correct that the Defendant prevented it from installing its recommendations. But the Plaintiff is wrong that this constituted a breach of the contract. Again, the Plaintiff's argument stems from its mistaken notion that once the Plaintiff recommended a program, the Defendant could not reject it and choose a competitor for the same, or similar, undertaking. The engagement letter gave the Defendant "the final decision as to the installation or recommendations" and, with that, an option to prevent the Plaintiff from installing the recommendations.

## CONCLUSION

The Court will not inject itself into the free market and will not hinder sophisticated parties from making agreements as they see fit for themselves. More so, the Court will not rewrite the engagement letter to include terms that were not originally there. As written, the contract required the Plaintiff to analyze the Defendant business, recommend changes or improvements, and, if approved, install the recommendations. Upon the installation, the Defendant was obliged to compensate the Plaintiff with a share of its profits derived from the improvements.

The Plaintiff analyzed the Defendant's finances and proposed changes. However, the Defendant chose Stratis to implement the NSF/OD program and decided to sell the Credit Card Portfolio on its own. Thus, the Plaintiff was not compensated despite many hours spent on extensive analysis of the Defendant's business. Yet, that was the risk the Plaintiff incurred by drafting a general, open-ended engagement letter without committing the Defendant to its consulting business exclusively and without specifically defining at least some of the objectives of their relationship.

The Court is without authority to turn back the clocks, and is left to GRANTING the Defendant's Motion for Partial Summary Judgment [DE 55].

In addition, for the reasons explained above, the Court GRANTS the Plaintiff's Motion to Strike [DE 68], DENIES the Defendant's Motion to Strike Affidavit of John M. Floyd [DE 100], and DENIES as moot the Plaintiff's Motion for Hearing on the Defendant's Motion for Partial Summary Judgment [DE 148].

SO ORDERED on July 14, 2005.


     S/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT