UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JOHN M. FLOYD & ASSOCIATES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:01-CV-355-TS |
| | ) |
| STAR FINANCIAL BANK, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion for Judgment as a Matter of Law and on Defendant's Amended Motion for Judgment as a Matter of Law. The motions were made orally at trial at the close of the Plaintiff's case and at the close of all evidence. The motions were renewed after the jury returned its verdict, as required by Rule 50.  The Defendant filed the briefs supporting its motions on November 8, 2005. The Plaintiff filed its Response on November 7, 2005, and a supplemental response on November 14, 2005.

**A.     Standard of Review**

Federal Rule of Civil Procedure 50 allows a court to enter judgment as a matter of law when the motion is first offered or to reserve judgment on the motion until after a jury has returned its verdict. In this case, the Court reserved judgment on the Defendant's motions and submitted the case to the jury. The jury returned a verdict for the Plaintiff. The Court will now address the Defendant's motions.

A judgment as a matter of law is granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue

. . . ." Fed. R. Civ. P. 50(a). "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 149 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

**B.     Background**

The Plaintiff, John M. Floyd & Associates, Inc., ("JMF") is a bank consultant. The Defendant, STAR Financial Bank, is a bank the Plaintiff agreed to advise. The parties' contractual relationship began in March 2000, when they signed an agreement to work with each other. The contract provided that the Plaintiff would work on a contingency basis and receive one third of the revenue resulting from the implementation of its recommendations: "The cost to Star Financial Bank for the engagement will be one-third of the first-year's pre-tax earnings that are the results of our recommendations plus out-of-pocket expenses." (Engagement Letter 2.) The parties agreed that the "Reverse Post" and "Five Percent Waiver" programs recommended by the Plaintiff were accepted by the Defendant and that the Plaintiff is entitled to one third of the revenue generated by those

2

programs. However, the parties disagreed how much revenue was generated by the programs. The Defendant also alleged that the contract required the Plaintiff to install a tracking document to record increases in revenue and the Plaintiff failed to do so resulting in a material breach of contract and relieving the Defendant of its duties. The case went to trial on November 1, 2005, and the jury returned with a $426,856.00 verdict for the Plaintiff on November 8, 2005.

### C. Defendant's Arguments

The Defendant advances several arguments supporting judgment in its favor. First, the Defendant argues that the Plaintiff was required by the agreement between the parties to create a document to track the revenue increased by installation of the Plaintiff's recommendations and that the Plaintiff materially breached its contract with the Defendant by failing to create such a tracking document. Second, the Defendant argues that the evidence submitted by the Plaintiff is legally insufficient for a reasonable jury to find that the Plaintiff suffered damages because they had no retained expert to render an informed opinion on damages. Third, the Defendant argues that the evidence submitted by the Plaintiff is legally insufficient for a reasonable jury to find that the Plaintiff suffered damages because the Plaintiff's calculation is not based on the "base period" required by the parties' contract. Fourth, the Defendant argues that the evidence submitted by the Plaintiff is legally insufficient for a reasonable jury to find that the Plaintiff suffered damages because the Plaintiff's calculation includes revenue that is not attributable to the program installed by the Plaintiff.

Under Indiana law, contract interpretation is an issue for the factfinder if the contract is ambiguous or uncertain in its terms and extrinsic evidence may be needed to determine and give

effect to the parties' reasonable expectations. *Fresh Cut, Inc. v. Fazli,* 650 N.E.2d 1126, 1133 (Ind. 1995) ("Here, however, while the contract is ambiguous and uncertain in its terms, we believe that the meaning of the contract may well need to be determined by extrinsic evidence. As such, its construction is a matter for the factfinder."). "The test for determining if a contract is ambiguous is whether reasonable persons would find the agreement subject to more than one interpretation." *Jacobs v. Hilliard*, 829 N.E.2d 629, 633 (Ind. Ct. App. 2005). Thus, if a term is susceptible to more than one reasonable interpretation, and extrinsic evidence is needed to determine the interpretation the parties intended when they entered into the contract, then there exists an issue of fact for the jury that this Court cannot decide as a matter of law.

### 1.      *Sufficiency of the Plaintiff's Tracking Document*

The Defendant argues that the parties' agreement required the Plaintiff to create a document to track the revenue generated by its recommendations, that the Plaintiff did not do so, and that this failure was a material breach of the contract. The Defendant's argument is based on provisions from the Engagement Letter, which both parties agree is part of their contract. The Engagement Letter states that the Plaintiff will "[d]esign and install monitoring and reporting mechanisms in order to chart progress, performance and results." The Plaintiff provided the Defendant with a document entitled "Conduct of Engagement" when it began its consultation with the Defendant. That document states: "An Excel spreadsheet will be created to track increases in income and reductions in expense as a result of this project." The parties dispute whether the Conduct of Engagement is a part of the contract. The Plaintiff responds that it met its obligation to create a tracking document and if the tracking document is insufficient, it is because the Defendant did not provide the Plaintiff

with the documents necessary to create the tracking document. Alternatively, the Plaintiff argues that the Defendant waived any breach of contract by going forward and installing the Plaintiff's recommendation without a sufficient tracking document.

This Court found that these were all issues of fact for the jury to decide and that it was proper to submit to the jury instructions on incorporation by reference, material breach, interference with performance of a contract, and waiver of contract terms.

Indiana law is clear that "[w]hether a party is in material breach of contract is a question of fact . . . ." *Smith v. State Lottery Comm'n of Ind.*, 812 N.E.2d 1066, 1073 (Ind. Ct. App. 2004); *see also Titus v. Rheitone, Inc.,* 758 N.E.2d 85, 94–95 (Ind. Ct. App. 2001). The Plaintiff submitted evidence sufficient for a jury to find that no material breach of contract occurred. It offered documents Mark Roe and John Floyd characterized as tracking documents. The Plaintiff provided testimony that the "monitoring and reporting mechanisms" the Plaintiff was required to provide "to chart progress, performance and results" were implementation schedules listing the status of each of the recommendations made by the Plaintiff.

The Plaintiff also argued that it was prevented from creating a more comprehensive tracking document because the Defendant refused to cooperate. Whether Defendant's actions prevented the Plaintiff from carrying out its contractual obligations is also a question for the fact finder. *See Rogier v. Am. Testing and Eng'g Corp.*, 734 N.E.2d 606, 621 (Ind. Ct. App. 2000). There was sufficient evidence for a jury to find that the Defendant prevented the Plaintiff from performing. The Plaintiff presented testimony that the Defendant failed to inform the Plaintiff when the Reverse Post recommendation was to be implemented and that the Defendant refused to provide the documents necessary for the Plaintiff to create a more comprehensive tracking document.

The Plaintiff argued that the Defendant waived strict performance of the contractual terms by going ahead with the installation of the Plaintiff's recommendations. Whether a party has waived the contractual duties of the other party is also ordinarily a question for the fact finder. *See Rogier,* 734 N.E.2d at 620; *van de Leuv v. Methodist Hosp. of Ind., Inc.*, 642 N.E.2d 531, 533 (Ind. Ct. App. 1994) ("Whether there has been a waiver of a contract provision is ordinarily a question of fact."). The Plaintiff showed that the Defendant installed the Plaintiff's recommendations knowing that no tracking document had been created. The Plaintiff presented testimony that it was never asked by the Defendant about a tracking document before the installation of the recommendation. A jury could reasonably infer that the Defendant had waived strict performance of the Plaintiff's obligation to create a tracking document.

Because it is for the fact finder to determine whether there was a material breach of contract, as well as whether a breach of contract was waived and whether performance was prevented, and because there is sufficient evidence for a jury to find for either party on those issues, the Defendant's motion for a judgment as a matter of law regarding the Plaintiff's material breach of contract is denied.

**2.    *Necessity of an Expert to Establish Damages***

The Defendant's argument that the Plaintiff was required to present testimony of an outside expert to provide sufficient evidence on damages is also faulty. The Defendant offers no caselaw to support this argument. The Court notes that under Indiana law, expert testimony is necessary to establish elements of some claims when the evidence is not within the understanding of a lay person. *Daub v. Daub*, 629 N.E.2d 873, 878 (Ind. Ct. App. 1994) (stating in a medical malpractice case that:

"[w]hen the issue of cause is not within the understanding of a lay person, testimony of an expert witness on the issue is necessary"); *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1103 (S.D. Ind. 2003) (holding that expert testimony is required to establish elements of a products liability claim when there is insufficient evidence within a lay person's understanding to constitute a basis for legal inference). Whether there is a general rule that expert testimony is necessary when evidence is outside the understanding of lay persons need not be determined in this case because even under such a rule Defendant's argument would fail.

First, the Plaintiff did offer expert testimony in the form of Mark Roe. Mr. Roe is a JMF employee, educated, trained, and experienced in banking issues. Mr. Roe was personally familiar with the circumstances underlying the dispute and applied with sufficient reliability his method of calculating the amount the Defendant's revenue increased as a result of the Plaintiff's recommendations. Second, the Court is not convinced the damages calculations were outside the understanding of lay persons. The Plaintiff arrived at its damages estimate by comparing revenue in the account for overdraft fees from a period previous to the implementation of the Plaintiff's recommendations ("base period") to revenue in the account after the implementation of the Plaintiff's recommendation. The Plaintiff calculated the percentage increase in revenue between the periods. That percentage was applied to the revenue increase over the year to find the total increase in revenue arising from installation of the Plaintiff's recommendations of which the Plaintiff claimed one third as its fee under the agreement. Such mathematical calculations are not so complex as to be outside the understanding of lay persons.

Because the Plaintiff did have expert testimony regarding its damages and because the Plaintiff's damage calculations could be understood by lay persons, the Plaintiff has provided

7

evidence sufficient for a reasonable jury to rule in its favor.

### 3. *Appropriate Base Period to Calculate Damages*

The Defendant's third argument is that the contract required a specific base period for calculating the Defendant's earnings and the Plaintiff's damages calculations did not use that base period. Thus, the Defendant reasons, the Plaintiff has no evidence on damages sufficient for a reasonable jury to find for the Plaintiff.

Again, the "test for determining if a contract is ambiguous is whether reasonable persons would find the agreement subject to more than one interpretation." *Jacobs v. Hilliard*, 829 N.E.2d 629, 633 (Ind. Ct. App. 2005). The parties' agreement, the Letter of Engagement, in the section entitled "Quantification of Earnings," states:

> Increases in non-interest income and reductions in non-interest expense are based on reasonable changes which can be affected on existing income and expense levels realized as a result of our recommendations. Earnings will be tracked on a line item by line item basis, utilizing the previous three months normalized as a base. . . .

(Letter of Engagement 3.) It is clear the contract calls for a three month base period, the question is whether "previous three months" was intended to mean the three months previous to the installation of the Plaintiff's recommendations or the three months previous to the agreement. In the Court's view, a reasonable person could agree with either interpretation. The true intent of the parties cannot be gleaned from the document alone and extrinsic evidence is necessary to determine the parties' intent. Therefore it must be left to the fact finder.

The Plaintiff has provided evidence sufficient for the jury to agree with its interpretation. The Plaintiff points to the "Conduct of Engagement" as extrinsic evidence on intent. The Conduct of Engagement states: "We will analyze each non-interest income item on the Star Financial Bank

8

general ledger for the months of January, February, and March 2000, utilizing those months as a basis for projected fee income. We will make recommendations as to opportunities for increased income and will quantify the projected amounts." (Conduct of Engagement 1.) The passage seems to suggest the January to March period will be used for revenue projections. The Plaintiff argues that this passage also refers to the base period for calculating the increase of revenue resulting from its recommendations. Mr. Roe testified that he told STAR employees that this would be the "base period" and that the Defendant never gave Mr. Roe information regarding any other three month period. The Plaintiff presented testimony from John Floyd, who said that because of the large number of recommendations, to use the three months previous to installation of each recommendation would result in a large number of base periods making revenue tracking unwieldy. Also, the January to March period would be the "purest" period from which to measure revenue growth because none of the Plaintiff's recommendations had been installed in that period.

The Defendant argues that the Plaintiff cannot simultaneously deny that the Conduct of Engagement document is a part of their contract while at the same time relying on the Conduct of Engagement document to show the parties' intent as to what the base period would be. However, the Defendant offers no case law showing that the Plaintiff cannot use documents outside of the agreement as extrinsic evidence to show the intent of the parties regarding ambiguous terms, such as those here. Extrinsic evidence is allowed to show the parties' intent regarding terms in the contract where the contract is ambiguous and meaning cannot be given to the terms based on the contract alone. *Fresh Cut, Inc.*, 650 N.E.2d at 1133.

Because the three months referred to in the contract is ambiguous, it is up to the fact finder to determine whether the Plaintiff's interpretation is what the parties intended.

9

**4.** *Inclusion of Courtesy Coverage Revenue in Damages*

Finally the Defendant argues that the Plaintiff's calculation of how much revenue the Defendant earned from installation of the Plaintiff's "Reverse Post" program includes revenues attributable solely to the Defendant's "Courtesy Coverage" program. Reverse Post is a method of ordering checks when they are charged to a customer's account; the smallest checks are charged last resulting in more overdraft fees for the bank. Courtesy Coverage is the Defendant's program to cover participating customers' bad checks, though it still charges the standard overdraft fee.

The Defendant did not install the Plaintiff's recommended Courtesy Coverage program; rather, it rejected the Plaintiff's recommendation and installed a competitor's program. As stated in the Court's July 14, 2005, Opinion and Order, the Plaintiff is entitled to no revenue solely attributable to the Defendant's Courtesy Coverage program. The Court's Opinion did not otherwise limit the extent to which the Plaintiff can collect on the increase of revenue attributable to the Reverse Post Program.

Again, the contract entitles the Plaintiff to "one-third of the first-year's pre-tax earnings that are the results of our recommendations." (Engagement Letter 2.) While admitting that it is not entitled to revenue increases resulting solely from the Courtesy Coverage program, the Plaintiff presented evidence at trial suggesting that while the Defendant's Courtesy Coverage program increased revenue in the overdraft account, the Plaintiff's Reverse Post program increased the revenue received from the Courtesy Coverage program to the same percentage it increased overdraft fees generally. The Plaintiff offered sufficient evidence for the jury to agree. The Plaintiff presented testimony from Mr. Roe and STAR employees that checks covered by the Courtesy Coverage program were posted according to the Reverse Post ordering method. The Defense did not offer any

evidence to the contrary. Though the Courtesy Coverage program likely induced STAR customers to write more checks while having insufficient funds, thus generating more overdraft fees, these additional bad checks had to be posted to the customers' accounts in some order. Because they were posted according to the Reverse Post method, the Plaintiff is entitled to one third of the revenue caused by using this posting order. The Plaintiff calculated a 37.7% increase in revenue from using Reverse Post instead of the old posting method. Because Courtesy Coverage checks employed this posting method, the Plaintiff is entitled to revenue generated within the Courtesy Coverage program resulting from Reverse Post.

The Defendant points to Mr. Roe's testimony that Courtesy Coverage revenues "polluted" calculations for Reverse Post revenues as evidence that the Plaintiff's calculations are improper. The context of Mr. Roe's statement is important. The beginning of the Courtesy Coverage program in October 2000 did pollute calculations of the percentage by which Reverse Post increased revenues over the previous posting method. In determining the percentage increase, ideally there would be no variables between the base period and the post-installation period other than the installation of Reverse Post. A major new program like Courtesy Coverage pollutes only this calculation (which is why Mr. Roe made the installation of the Courtesy Coverage program his cut-off point). But so long as Courtesy Coverage did not affect the posting order, it does not "pollute" the application of the percentage increase to the yearly revenue from overdraft fees.

Under Indiana law, "a factfinder may not award damages on the mere basis of conjecture or speculation" and "damages must be proven with reasonable certainty." *Noble Roman's, Inc. v. Ward,* 760 N.E.2d 1132, 1140 (Ind. Ct App. 2002). However, "[n]o degree of mathematical certainty is required in awarding damages as long as the amount awarded is supported by evidence in the

11

record." *Romine v. Gagle,* 782 N.E.2d 369, 382 (Ind. Ct. App. 2003). The Plaintiff's evidence was sufficient for a reasonable jury to find that the Courtesy Coverage program used the Reverse Post program to enhance the Defendant's revenues from overdraft fees. The Plaintiff's calculations that revenue from overdraft fees with Reverse Post installed was 37.7% higher than it would have been without Reverse Posting is based on probative evidence and sufficiently definite to withstand judicial scrutiny.

**D.     Conclusion**

For the reasons stated, the Defendant's renewed motions for judgment as a matter of law [DE 231 & 232] are DENIED. Judgment is ENTERED for the Plaintiff in the amount of $426,856.00. The Court also notes that Plaintiff's motion for judgment as a matter of law [DE 229] was denied during trial.

SO ORDERED on November 21, 2005.

                                      s/ Theresa L. Springmann
                                      THERESA L. SPRINGMANN
                                      UNITED STATES DISTRICT COURT